## JOHN HANNON v. HENRY H. HOUSTON.

1. AGENT, AND AGENCY; *Powers of Agent, Limited by Letter of Appointment.*
H. owned certain county bonds and coupons issued by the county of
Leavenworth, and payable at the Metropolitan National Bank of New
York. These bonds had long been over-due and dishonored, and their
negotiability destroyed. H. resided in Philadelphia, and sent said bonds
in a letter to M., who resided in Leavenworth county, stating in said
letter as follows: "I send you the following bonds and coupons of the
county of Leavenworth which you will please do the best you can *in
settlement;* treat them the same as you would if they were your own,"
(giving a description of the bonds, and then:) "We had the bonds and
coupons that were due presented for payment at the Metropolitan Bank,
New York. They said there was no money to meet them, and had not
been for some years. Hoping you may be able to *make a settlement,*" etc.
*Held,* That said letter did not give to M. any power to sell said bonds to
a third person, or any power to authorize any other person to do so.

2. —— *Unauthorized Sale, is Void.* Afterward M. delivered said bonds
to S., an attorney-at-law and business agent, though not a dealer in bonds,
for the purpose that S. should collect the amount thereof from the county
in money or new bonds, or in both; but S., in violation of his duty, sold
said bonds to J. H., a third person, for a valuable consideration. *Held,*
That such a sale was void.

3. ESTOPPEL; *What Facts held No Estoppel.* S. had said bonds in his pos-
session about three weeks from the time he received them until he sold
them. At first he informed J. H. and others that he had them for col-
lection, but afterward he offered them for sale to several persons. M. at
one time, on the request of S., consented that S. might receive offers for
said bonds for the purpose of sending such offers to H.; but M. never
authorized S. to offer said bonds for sale, and neither M. nor H. ever
knew until after the sale that S. ever did offer the same for sale. S. re-
ported two offers for the bonds to M., and M. reported one of such offers
to H., who declined the offer. *Held,* That, taking all of the facts of this
case together, they did not authorize S. to make said sale, and they do
not estop H. from denying the authority of S. to make the sale.

*Error from Leavenworth District Court.*

ACTION by *Henry H. Houston,* against *John Hannon,* and
the *Board of County Commissioners* of Leavenworth county,
to recover the moneys due on four certain bonds issued by
said county of Leavenworth on the 1st of August 1865.
Plaintiff alleged that the bonds belonged to him, and that they

had been unlawfully converted by the defendants. The facts are fully stated in the opinion, *infra*. The district court, at the March Term 1876, gave judgment in favor of *Houston* and against the *Board of County Commissioners*, for $3,033, and costs, and in said judgment it was determined that defendant *Hannon* was personally liable for $910 of the whole sum found due. Defendant *Hannon* appeals, and brings the record here by petition in error, joining plaintiff *Houston* and the *Board of County Commissioners*, as defendants in error.

*Stillings & Fenlon*, for Hannon, plaintiff in error, contended, that the bonds in suit had, through the agency of Houston's friend and his agent, been hawked about the streets for sale for two or three weeks, until Hannon was induced to purchase them and part with $960, the price paid for them. Hannon had a right to have the question of the power, actual or constructive, of Martin or Spry, to dispose of these bonds submitted to a jury, and whether the plaintiff below could recover either the bonds or their price without tendering or offering back the money paid, a part of which Spry had, and a part of which was returned to the credit of Martin. The principle of law is a familiar one, and one which this court has applied in the case *Malony v. Clark*, 6 Kas. 82, that if one of two innocent persons must suffer by the act of a third, he who enabled that third party to do the injury must bear the loss. (4 Ohio St. 529; 34 N. Y. 59; 63 Penn. St. 87; Story on Agency, §§ 56, 93, 94; 42 Iowa, 113.) There can be little doubt that the acts of Houston in placing his bonds in the hands of a friend, with instructions to treat them as his own, and allowing them to be hawked about the streets for offers, resulted in deceiving the plaintiff in error into buying the bonds and paying the money for them. It is the same in principle as that of a man who sends his servant to a horse-market with his horse, in which case if the servant wrongfully sell the horse, the owner is bound, because by his acts the apparent authority is given to the servant to sell. These bonds were negotiable, and transferable by de-

livery; and the conduct of the principal induced the agent himself, though as well a lawyer as commission agent, to think he had power to sell. But the plaintiff in error is told by the court below, that, although the manner in which Houston conducted this affair, induced Spry to believe he could sell, and Hannon to purchase and place the $960 in possession of Spry in place of the bonds, yet that Houston can repudiate the action of Spry without tendering back the money or any part of it. We submit that such is not the law.

*L. M. Goddard, J. W. Taylor,* and *J. C. Douglass,* for the county of Leavenworth, submitted, that the county board, although a defendant in error upon the record, was in fact in the position of a complaining party, and could properly object and complain of the judgment of the district court. The county cannot be a party to a conspiracy; it.is bound only by the lawful and authorized acts of its board of commissioners. To make the county liable, the plaintiff relies on the alleged illegal and fraudulent acts of certain officers. The acts of Ashby the chairman, of Diefendorf the clerk, and of Hannon the chairman of the committee of ways-and-means, he alleges to be unauthorized and unlawful. If so, the county was not affected thereby; 19 Pick. 511 ; 31 Ala. 469; 3 Col. 205. But the four bonds mentioned, if otherwise valid, were at the time of the commencement of the action, barred by the statute of limitations. The payment to Spry was an unlawful and unauthorized act of the treasurer, and was made upon outlawed coupons, detached from the bonds. Such payment was made without the knowledge or sanction of the board. By subsequently approving of the treasurer's account, it cannot be held to have intended to ratify such illegal acts, when, as a matter of fact, it had no knowledge it had been done. The county is not estopped from questioning the allowance of an illegal claim by the board of commissioners; 76 Ill. 545; 4 Wend. 455. If the commissioners can by payment of interest, or acknowledgment in writing, prevent

the statute from running, such payments should certainly be made with the view of accomplishing that end, and not inadvertently, as in this case; 32 Ill. 382, 386. The only member of the board who had knowledge that the payment of these coupons had been made at the time the treasurer's account was approved was Hannon, the party that the plaintiff charges with fraud, and upon whose fraudulent actions he based his right to recover, and notice to him should not be considered notice to the board.

*Clough & Wheat*, for Houston, plaintiff below, as to the statute of limitations set up in the answer of the county, contended, that the payment to Spry and Hannon of interest on the bonds, and the fact that such payments were approved, and credit therefor given to the county treasurer, by the county board, and the fact that taxes were levied by the county for interest on said bonds in 1871, 1873, 1874 and 1875, and particularly the paying of interest to Spry in May 1875, saved the case from being barred by the five-years limitation law, even if but for such payment the action against the county would have been barred. And further in this connection, as to the effect of the payment of interest, we refer to 49 N. Y. 155; 21 La. An. 423; 51 Mo. 31. But the four bonds were overdue when Houston first in March 1875 sent them to Martin, and they had for years been overdue at the time Hannon claims he bought them from Spry. And as Houston did not authorize any person to sell the bonds, and has not ratified any pretended sale thereof, therefore, even if Hannon had *bona fide* purchased the bonds from Spry, without the notice that Spry had them for collection only, Hannon would not have acquired any right to the bonds, and any payment of interest or principal thereon to Hannon would not avail the county as a payment as against Houston. An overdue note or bill is, as to a sale or transfer thereof by a person not authorized to sell or transfer the same, governed by the same rules as the sale of a cord of wood, or any other article of that description. The

rules in relation to negotiable paper have in such case no application, so far as the question of right or title is concerned, even though the note, or other negotiable security be payable to bearer, or indorsed in blank.

One who buys a note, bill or other negotiable security, *bona fide,* and for value, *after it is due,* from one who has no title to it, acquires *no title* against the true owner; 6 Wallace, 492; 8 Geo. 421, 424, 428 to 435. And see also, 39 Barb. 645; 17 Conn. 511; 4 B. & C. 330; 10 E. C. L. R. 602. Hannon is liable to Houston for whatever money he received or converted to his own use on account of said bonds. As Hannon did not acquire any right to said bonds by his purchase thereof from Spry, therefore any payment to him by the county does not operate as a credit in favor of the county as against Houston, and the county remains liable to Houston for the full amount of the bonds and interest thereon from the time the same came due; Byles on Bills, p. 342; 2 Pars. Notes and Bills, 211; 2 Camp. 485; 14 Kas. 542. The county had notice that Spry had the bonds for collection only — had notice that he could not sell. The whole business in regard to the bonds was between Spry and agents and financial agents of the county; and we submit that Hannon and the county each had notice, Hannon personally, and the county by its officers, that Spry had no authority other than *to collect the bonds;* (32 Vt. 125; 27 Miss. 284;) and that was sufficient affirmative notice to render Hannon's pretended purchase a wrongful and fraudulent act; 4 Kas. 412; 2 La. An. 577, 666; 1 Freeman's Ch. (Miss.) 417; 21 Wallace, 138. An attorney-at-law, who has been employed to collect a claim, has no power to sell the claim unless by express authority from his client; 18 Ohio, 411; 5 Vt. 346; 1 Bailey, (S. C.) 437; 58 Penn. St. 196; 39 Md. 486. One who has a promissory note put in his hands for collection, has no authority thereby to transfer it; 6 Ind. 216; 13 N. H. 104; 44 N. H. 354; 10 N. J. Eq. 21. An attorney cannot compromise his client's cause without his consent; 35 Tex. 711; 23 Mo. 387. An attorney clothed with no other au-

thority than that conferred by his retainer, has no authority to compromise and discharge his client's claim; 3 Metc. (Ky.) 438. An attorney who has a claim for collection cannot, without authority from his client, take a bond, or anything else but money, in satisfaction of the debt; 3 Md. Ch. Decis. 392; 8 Blackf. 291; 14 S. & R. 209; 3 Ind. 327. An attorney-at-law cannot bind his client by a contract entered into on his behalf without authority conferred, or subsequent ratification; 36 Maine, 149; 68 N. C. 341; 8 Blackf. 291. The power to *settle* given by Houston to Martin, did not give power to *sell*, and *general* words in Houston's letter to Martin must be construed with reference to the *special* matter; 14 Cal. 396; 38 Mo. 228; 28 Wis. 689; 10 Mich. 357. When one deals with another as an agent, he is bound to ascertain the extent of his authority; and if the agent exceeds his authority, the principal will not be bound; 12 S. & M. 398. Where an agent varies from a particular authority given him, his acts will not bind his principal; 3 Eng. 227; 11 Barb. 652. An agent cannot bind his principal by any act or declaration, which is out of the scope of his authority; 11 Eng. Law and Eq. 424; Walker, 149; 7 Wis. 419; Ware, 175; 10 Mass. 397, 403; 15 Johns. 44; 6 Vt. 334; 8 Wend. 494; 4 J. J. Marsh. 456; 18 Johns. 363; 1 Hill, (S. C.) 204. Agent deviating from his special duty—act void; 6 Monr. 577. A person is bound to know the extent of power of the agent with whom he is dealing; 9 Port. 210; 8 Kas. 297, 300.

The opinion of the court was delivered by

VALENTINE, J.: This was an action on four certain bonds issued by Leavenworth county to the Union Pacific Railway Company. These bonds are part of the same issue of bonds as those which were held to be valid and binding obligations against the county of Leavenworth in the cases of *Leavenworth County v. Miller*, 7 Kas. 479, and *Leavenworth County v. Higginbotham*, 17 Kas. 62; and nothing therefore need be said in this case with regard to their validity. The judgment rendered by the court below in this case was in favor of

Opinion of the Court.

Houston, plaintiff below, for the sum of $3,033. It was so rendered that Houston might collect the whole of the judgment from the county of Leavenworth, or might collect $910 of the same from John Hannon, (one of the defendants below, and now plaintiff in error,) and the balance from Leavenworth county. But in case he collected the whole of the judgment from Leavenworth county, then the county was given the right to collect said $910 from Hannon. Both Hannon and the county now claim that said judgment was erroneous, and both now seek to have the same reversed so far as it was rendered in favor of the plaintiff Houston. Both Hannon and the county will therefore be considered in this court as plaintiffs in error, upon the errors assigned by each respectively. Said bonds belonged to Houston, and were sold by one George H. Spry to Hannon; and the principal question involved in the case is, whether Spry had any authority to so sell said bonds.

The facts of the case so far as it is necessary to state them, are as follows: Houston resided in Philadelphia, Pennsylvania. The other persons hereinafter mentioned resided in Leavenworth county, Kansas, and the most of them in Leavenworth city. Said bonds were for $500 each, and were numbered respectively 38, 39, 40, and 41. Each bond had one or more interest coupons attached to it, and there were eight coupons in all. These coupons were for the semi-annual interest accruing on the bonds, and each coupon was for $17.50. Both the bonds and the coupons were payable by the county of Leavenworth at the Metropolitan National Bank of New York. On the 2d of March 1875, Houston, who was then the owner of the bonds, with said coupons attached, sent them all to one William A. Martin at Leavenworth with the following letter, to-wit:

PHILADELPHIA, MARCH 2d, 1875.

WM. A. MARTIN, *Leavenworth—Dear Sir:* I send you the following bonds and coupons of the county of Leavenworth, which you will please do the best you can *in settlement.* Treat them the same as you would if they were your own. Nos. 39, 41, two bonds, series B, each $500, due Mch. 1, 1868,

with coupons for $17.50, each. Nos. 38, 40, two bonds, series C, each $500, due Mch. 1, 1869, with three coupons for $17.50 each. Nos. 51, 56, 58, three bonds, series D, each $1,000, due Sept. 1, 1865, with fifteen coupons for $35 each. We had the bonds and coupons that were due presented for payment at the Metropolitan Bank, N. Y. They said there was no money to meet them, and had not been for years. Hoping you may be able to *make a settlement*, I am yours truly, H. H. HOUSTON, (*Pr. Geo. B. B.*)

Said bonds numbered 51, 56 and 58 have nothing to do with this case. On May 3d 1875, (which was the first Monday of May,) the board of county commissioners of the county of Leavenworth were to meet in session. On that day, Martin handed said bonds and coupons to Spry to collect, or to get new bonds in their place, or partly both. Spry was at that time an attorney-at-law and business agent, but he was not at that time a dealer in bonds. If he ever was or had been a dealer in bonds, it is not shown in this case. About three, or four, or five years prior to that time, he was a partner in the firm of Atwood & Russell, who were real estate agents and dealers in securities. But it is not shown in this case that Spry ever sold or offered to sell a single bond except the bonds in controversy in this case. Spry, immediately after receiving said bonds and coupons from Martin, collected so much of the interest due on said bonds as was represented by said eight coupons, amounting in the aggregate to $140. On the next day, to-wit, May 4th, Spry presented to the county board of Leavenworth county — the board then being in session — the following petition, to-wit:

*Office of Geo. H. Spry, Attorney-at-Law, No. 315, Delaware St.,*
LEAVENWORTH, KANSAS, MAY 4th, 1875.

*To the Hon. Board of Commissioners of Leavenworth Co., Kas.*

*Dear Sirs:* I have in my hands *for collection* four bonds of Leavenworth county, which were issued to the "Union Pacific Railway Company, Eastern Division." These bonds are for five hundred dollars each. *The interest coupons attached to them have all been paid,* but the interest accrued from maturity of such bonds is still due. These bonds belong to an estate in which, I understand, some minor heirs are interested, and

the reason why they have not been previously presented for payment is because the administrator of the estate was not, for a long time after qualifying as such, aware of their existence. I am authorized to state that if the interest now due on these bonds is paid *at once*, and new bonds for the principal are given, such an arrangement will *now* be accepted. I trust that your honorable board will fully appreciate this matter, and beg a prompt settlement of the interest; and an issue of new bonds will indicate the honor and credit of our county. Yours truly, GEORGE H. SPRY.

All the italics in the body of this petition, and in the foregoing letter of Houston's, except the words "at once," and "now," are ours. Said Hannon was at that time a member of the board of county commissioners of Leavenworth county, and was also chairman of the committee of ways-and-means; and Spry's petition was referred to that committee. Hannon at that time told Spry in substance, that said petition could not be allowed, that the bonds were barred, and the county under no legal obligation to pay them. No report was ever made by the committee concerning said bonds. Spry kept the bonds for about three weeks, and in the meantime offered them for sale to several persons. He received several offers for them, the highest of which was $500. John Higginbotham offered him $500 for them, and Herman Markson offered him $300 for them. Prior to receiving these offers however, Spry asked Martin if the bonds were for sale. Martin answered, "that would depend on the owner, Mr. Houston." Spry then said: "Suppose I see if I can get an offer?" Martin answered: "That is all right; you can see what is offered, and I will write to Mr. Houston." Afterward Spry reported Markson's offer to Martin, and wanted Martin to write to Houston. Martin said it would be useless. Spry then said "perhaps he could get a better offer." Some days afterward Spry reported Higginbotham's offer, and then Martin consented to write to Houston. Martin did not write however, but telegraphed to Houston. Houston replied both by telegram and by letter, declining the offer. As soon as Martin received the telegram he informed Spry that Hous-

ton declined the offer. These two offers were the only offers that Spry ever reported to Martin. And Spry during all that time never informed Martin that he had ever offered said bonds for sale, or that he had ever entertained any intention of selling them unless he first got the consent of Houston and of Martin; and there was no evidence introduced tending to show that either Houston or Martin knew, during any of said time, that Spry was offering said bonds for sale. As before stated, Martin telegraphed to Houston Higginbotham's offer. And in answer thereto Houston returned the following telegram:

PHILADELPHIA, PENN., 5, 26, 1875.
To W. A. MARTIN: Do not feel like selling at five hundred. Will write.                    H. H. HOUSTON.

Martin also received in answer the following letter from Houston, to-wit:

PHILADELPHIA, MAY 27th, 1875.
WM. A. MARTIN, ESQ.—*Dear Sir:* We received your dispatch yesterday, reporting that you had an offer of $500 for the $2,000 Leavenworth county bonds overdue and unpaid, which we telegraphed you to decline. We understand that that if suit is brought in the U. S. court for the amount of overdue bonds, it could be collected. Will you please consult Mr. Hurd, an attorney of your town, who has had experience in this matter—he having brought suit and collected moneys on these bonds for other parties. If he advises that you can collect by bringing suit, please let him do so on the bonds you hold in the name of H. H. Houston, a citizen of Philadelphia, if the name of a non-resident is required. Yours truly,                    H. H. HOUSTON.

About May 20th, to 28th, 1875, Hannon borrowed $1,000 of Thomas Leonard, and handed the same to one Patrick H. Madden, with the instructions for Madden to purchase said bonds for Hannon, and that Madden might retain all of said money that might remain after paying for said bonds. Madden purchased the bonds of Spry, paying Spry therefor $960, and retained the other $40. At this time said bonds had long been overdue and dishonored, and their negotiability destroyed. About this time, eight new bonds, each for $250,

with interest coupons attached, payable to the "Union Pacific railway company, eastern division, or bearer," were issued by W. T. Ashby, chairman, and Oliver Diefendorf clerk of said county board, in lieu of said four Houston bonds. These new bonds were delivered to Hannon. It would seem that the interest on the Houston bonds amounted on 1st March 1875 to the sum of $910. Of this interest, $490 had accrued prior to 1st March 1872, and $420 afterward, and up to 1st March 1875. For the interest which accrued subsequent to 1st March 1872, overdue coupons representing the same were attached to said new bonds. But no provision was made in the new bonds for the payment of the interest which accrued prior to 1st March 1872. Hannon therefore procured one Edmund Rupert to collect said interest which had accrued on said Houston bonds prior to 1st March 1872. Rupert thereupon signed receipts for the amount thereof, to-wit, $490, on the backs of said Houston bonds, and the county treasurer, in consideration thereof, issued to him a check for the same amount on a certain bank in which the county funds were deposited. This check was dated May 28th 1875, and was payable to "E. Rupert or order." Rupert then indorsed said check and handed it to Hannon. Hannon then delivered said check, without other indorsement, to Thomas Leonard in part payment of said $1,000 borrowed of Leonard. Leonard then indorsed said check and drew the money thereon. This money belonged to the county; and although Leonard drew it, Hannon was the only person who is really chargeable therewith. There were six of said overdue coupons attached to each of said new bonds, or forty-eight in all. Each was for $8.75, or for $420 in the aggregate. These coupons, as before stated, represented the interest which had accrued on said Houston bonds subsequent to 1st March 1872 and up to 1st March 1875. For these coupons Hannon received, in June 1875, $420 of the county funds deposited by the county in New York city. Hannon therefore received in the aggregate $910 of the county funds

(for past-due interest on said Houston bonds;) and for this amount said judgment was rendered against him.

Martin was not informed until the 9th of June 1875 that Spry had sold said bonds of Houston. As soon as Martin was informed, he went to Spry, and to Madden, and repudiated the sale, claiming that Spry had no authority to sell the bonds, and tried to get the bonds back. Martin could not at that time ascertain for whom Madden had purchased the bonds. Although Madden admitted that he did not purchase them for himself, yet he refused to tell for whom he did purchase them. Spry testified that he (Spry) did not know at the time of the sale for whom they were purchased, but supposed they were purchased for Madden. Spry at the time of said interview, and in the presence of Madden, told Martin that he (Spry) received $500 for the bonds, and Madden neither assented nor dissented. On that same day, June 9th, Spry deposited in the First National Bank of Leavenworth $475 to the credit of Martin. Therefore out of the $140 received by Spry for coupons, and $960 received by him for the bonds, (total, $1,100,) he kept $625. On the next day Spry left Leavenworth and went to Minneapolis, Minnesota, where he still resides. Martin never received nor accepted any portion of said $475, but it still remains in said bank. Afterward Martin ascertained that Hannon was the purchaser of said bonds, and in July 1875 Houston commenced this action. The county commissioners of Leavenworth county levied taxes for the years 1868, 1869, 1871, 1873, 1874, and 1875 for the purpose of raising funds to pay interest on the bonds issued to the Union Pacific Railway Company, E. D. Such funds were raised, and the county treasurer paid interest on said bonds, evidently as it was intended that he should by the county board when they raised the funds. He paid $140 interest on the Houston bonds to Spry; he paid $490 interest on the Houston bonds to Rupert; and he paid $420 interest on the new bonds, which was really overdue interest on the Houston bonds, to Hannon.

And this was all done in May and June 1875. The treasurer reported all of these payments to the county board, and the county board, with said coupons and other vouchers of the treasurer before them, approved the treasurer's report, and gave to him full credit for all of said payments. Spry also in his said petition to the county board had previously informed them that "the interest coupons attached to" said bonds had "all been paid." (In this connection see brief of counsel for Houston, and statutes and authorities there cited.)

We know of no other facts than the foregoing that would tend to show that Spry ever had any authority to sell said Agency; powers bonds. If Spry had any such authority it must of agent; unthorized sales. be because such authority was given by Houston to Martin, and by Martin to Spry, or because something had transpired which would estop Houston from denying Spry's authority. Now certainly Houston never gave to Martin any such authority, nor did Martin ever give to Spry any such authority. Houston simply said to Martin concerning said bonds and coupons, "You will please do the best you can *in settlement;* treat them [in such settlement] the same as you would if they were your own. * * * Hoping you may be able to *make a settlement,* I am yours," etc. There is not the remotest reference to a sale in Houston's letter. Martin at first simply authorized Spry to make a settlement with the county of Leavenworth, getting what he could in money and the balance in new bonds. Afterward Martin told Spry that he might receive offers to be sent to Houston, but Martin never authorized Spry to sell the bonds. Martin however could not have given to Spry any such authority, even if he had so desired, for he had no authority himself to sell the bonds.

Nor is there any sufficient ground for setting up any estoppel as against Houston. The bonds and coupons were all overdue and dishonored, and their negotiability destroyed long before Hannon purchased them. It was not shown that either Martin or Spry was a dealer in bonds, and the evi-

dence would certainly show that Spry was not a dealer in

Estoppel, when not created. bonds. Spry did not claim to own the bonds, but on the contrary informed the county commissioners (of whom Hannon was one) that he had the bonds in his hands merely "for collection." Neither Houston nor Martin knew anything about the sale to Hannon until some days after it occurred, and neither of them ever ratified the same. Indeed, neither of them knew that Spry was offering said bonds for sale. But Martin's knowledge or acts, whatever they might have been, would not affect Houston except so far as they were within the scope of Martin's agency, and connected with the business of the agency. A principal is often responsible for the unauthorized acts of his agent; but still he is not so responsible unless such acts are connected with the principal's business, and done within the course of the agent's employment. In this case Houston would have been responsible for all that Martin (and probably also that Spry) might have done in the settlement of his (Houston's) claim against the county; for in this they would have been acting within the scope of their authority, and their acts would have been connected with the business for which they were employed. But to sell said bonds, was wholly outside of their agency, and had no connection whatever with the business for which they were employed. If a farmer should take his horse into a blacksmith-shop to be shod, and would step out for a short time leaving the horse with the blacksmith, the blacksmith could not sell the horse. Of course, Spry did wrong in selling said bonds; but Hannon is the person who enabled him to do wrong. He did not do wrong as the agent of Houston. Of course, neither Martin nor Houston is responsible for the $475 deposited by Spry in the First National Bank. They never had anything to do with it. They never owned the money. It was deposited there without their knowledge; and they have never ratified the act of depositing it there. We think that Hannon got no title to said bonds; and in this connection would refer to the following authorities: *Foley v. Smith*, 6 Wall. 492; *Farring-*

*ton v. Park Bank,* 39 Barb. 645; *Thomas v. Kinsey,* 8 Georgia, 421. See also authorities cited in brief of counsel for Houston.

We think the court below committed no substantial error in this case, and therefore that the judgment rendered by it was correct.

The judgment will be affirmed.

All the Justices concurring.